# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MARK G. SCHAEFFER, SR., | ) | |
| | ) | |
| Plaintiff/Counterclaim-Defendant | ) | |
| | ) | |
| v. | ) | C.A. No. 2018-0926-MTZ |
| | ) | |
| DONALD LOCKWOOD, | ) | |
| | ) | |
| Defendant/Counterclaim-Plaintiff. | ) | |

## MEMORANDUM OPINION

Date Submitted: July 2, 2021
Date Decided: November 30, 2021

Theodore A. Kittila and James G. McMillan, III, HALLORAN FARKAS + KITTILA LLP, Wilmington, Delaware, *Attorneys for Plaintiff/Counterclaim-Defendant*.

Richard E. Berl, Jr., HUDSON, JONES, JAYWORK & FISHER, LLC, Lewes, Delaware, *Attorney for Defendant/Counterclaim-Plaintiff*.

**ZURN, Vice Chancellor.**

A bird dog is a hunting dog that locates game birds, flushes them out, and then retrieves any birds the hunter successfully shoots. The bird dog is a useful companion. It adds value to a hunter's efforts by finding attractive birds hidden in the bushes that the hunter might otherwise miss. Thanks to the bird dog's assistance, the hunter can shoot at visible targets, instead of indiscriminately shooting into the brush. The real estate industry has adopted the term "bird-dogging" to refer to seeking out undervalued, attractive real estate properties, and passing them along to motivated investors. Like the hunter, a real estate investor aided by a bird dog has access to hidden opportunities other buyers might miss. In exchange for these valuable efforts, bird-dogging real estate brokers typically earn a percentage or a fee.[1]

The plaintiff in this case is a real estate broker and a self-described bird dog. In 2015, he located an undervalued, attractive real estate opportunity, a residential subdivision in Milton, Delaware that was available in a foreclosure sale. True to his role, the broker brought the project to two potential co-investors: the defendant, a real estate developer, and the developer's consultant. The three were well-acquainted, being partners in an interconnected web of real estate ventures. The broker, developer, and consultant negotiated to purchase the subdivision from the

---

[1] *See Bird Dog*, Investopedia, https://www.investopedia.com/terms/b/bird-dog.asp (last visited Nov. 30, 2021); *see also Bird-Dog*, Merriam-Webster's Dictionary, https://www.merriam-webster.com/dictionary/bird-dog (last visited Nov. 30, 2021).

foreclosing bank. They also had characteristically informal discussions among themselves about how to structure their collective investment in the subdivision. But they never came to a final meeting of the minds on what that structure would look like. And the need for financing led the developer to partner with a new investor instead, with whom he formed a new entity, secured financing, and purchased the subdivision.

In the years that followed, the subdivision project's structure shifted. The developer, who previously held a 70% stake in the entity owning the subdivision, swapped his share to the investor in exchange for a percentage of the subdivision's profits. The broker stayed in the picture and helped with the subdivision's development, despite not having any formally memorialized stake. Eventually, the parties discussed a buyout for the broker's undefined interest in the subdivision, but no such transaction ever materialized. The broker and developer's relationship soured, the subdivision project fell apart, and the developer traded his profit interest to the investor for the investor's stake in a different venture.

The broker brings this action to recover his allegedly promised share of the subdivision's profits. His primary claim overplays his hand: he argues that he, the developer, and the consultant contracted to equally split the subdivision's profits. The parties' fluid arrangements and informal discussions do not support his contention. While there is evidence the parties contemplated a business relationship,

2

this post-trial opinion finds that the parties never formed a contract. In the alternative, the broker brings quasi-contract claims for promissory estoppel and unjust enrichment. Lacking clear and convincing evidence of a sufficiently definite promise, I find the broker is not entitled to recover under a promissory estoppel theory. But the broker's claim for unjust enrichment has merit; he should be compensated for his bird-dogging and other work on the project. Judgment is entered in his favor on that basis. Judgment is also entered for the broker on the developer's counterclaim. My reasons follow.

## I.    BACKGROUND

This matter was tried on February 9 and 10, 2021, and post-trial briefing concluded on April 12.[2] I took the matter under advisement on July 2.[3] The trial record includes seventy-six exhibits and live testimony from four witnesses.[4] I find the following facts based on a preponderance of that evidence.[5]

---

[2] *See* Docket Item ("D.I") 56; D.I. 65; D.I. 66.

[3] D.I. 69.

[4] Citations in the form "Tr. —" refer to the trial transcript, available at D.I. 57 and D.I. 58. Citations in the form "JX —" refer to the parties' joint trial exhibits. *See* D.I. 44.

[5] *Reynolds v. Reynolds*, 237 A.2d 708, 711 (Del. 1967) ("The side on which the greater weight of the evidence is found is the side on which the preponderance of the evidence exists."); *accord Taylor v. State*, 748 A.2d 914, 2000 WL 313501, at *2 (Del. 2000) (TABLE) ("The phrase 'preponderance of the evidence' has been defined to mean the side on which 'the greater weight of the evidence' is found." (quoting *Reynolds*, 237 A.2d at 711)).

### A. The Parties Make An Offer To Purchase The Deep Branch Woods Subdivision.

Deep Branch Woods (the "Subdivision") is a thirty-acre residential subdivision located on Draper Road (Route 5) in Sussex County, near Milton, Delaware.[6] The County approved twenty-six lots in the Subdivision for development, and its owners began improving it and cutting in roads.[7] In 2015, nonparty Cecil Bank initiated foreclosure proceedings on the Subdivision. This case concerns the subsequent purchase and ownership stake of the Subdivision.

A Cecil Bank representative approached plaintiff Mark Schaeffer to see if he would be interested in purchasing or developing the Subdivision.[8] Schaeffer is a real estate broker and has worked in real estate for approximately forty years.[9] He believed the Subdivision was an attractive investment opportunity because of its proximity to the Delaware beaches.[10] But he could not finance the project alone, and, as a matter of practice, did not invest cash in his real estate deals.[11] To fund the project, he approached John O'Brien, a former attorney, and defendant Don

---

[6] D.I. 42 ¶ 8; JX 1.

[7] JX 1; Tr. 9, 293–94.

[8] Tr. 292.

[9] D.I. 42 ¶ 5; Tr. 291.

[10] D.I. 42 ¶ 8.

[11] Tr. 299.

Lockwood, a real estate developer.[12] The three men are well-acquainted. Schaeffer and O'Brien are longtime social and professional acquaintances.[13] O'Brien represented Lockwood as an attorney and then worked for him as a consultant, becoming friends along the way.[14] Schaeffer and Lockwood also have a professional and personal history, albeit not as longstanding.[15] Their relationship has deteriorated.

Schaeffer, Lockwood, and O'Brien worked on real estate projects together in the past, and maintain an interconnected web of ventures.[16] Their projects were not always successful,[17] and they often traded stakes in their various ventures to compensate one another in other deals.[18] Around the time Schaeffer approached Lockwood and O'Brien about the Subdivision, the three were working on a student

---

[12] *Id.* 297–99. While the caption in this matter indicates Lockwood's first name is "Donald," Lockwood testified that his first name is simply "Don." *Id.* 221.

[13] *Id.* 6, 297–98.

[14] *Id.* 6–7.

[15] *Id.* 298 ("So, you know, I've known John [O'Brien] probably 40-plus years. I've known Don Lockwood now probably five years.").

[16] *E.g.*, *id.* 64–70, 262.

[17] *E.g.*, *id.* 64–65.

[18] *E.g.*, *id.* 136, 140–41, 167.

housing development project.[19] They were also involved in a separate real estate venture in Washington state, through an entity known as 222 Enterprises.[20]

Schaeffer, Lockwood, and O'Brien set out to purchase the Subdivision, believing they could do so at a substantial discount and make a good profit.[21] In March 2015, the trio began to negotiate with John Long at Cecil Bank.[22] In their initial May 7 letter of intent, the three gentlemen proposed to buy the Subdivision for $180,000.[23] Their letter indicated the buyer would be an entity called FDDC, LLC. FDDC was not a real entity and was never formed.[24] Schaeffer signed his own initials and Lockwood's name as FDDC's "managing member," with Lockwood's authorization.[25] Schaeffer emailed the letter of intent to Long on May 8.[26]

---

[19] *Id.* 7.

[20] *E.g.*, *id.* 7, 69.

[21] *See id.* 12–13.

[22] *Id.* 294–95; JX 2.

[23] JX 3 at 1.

[24] *E.g.*, Tr. 14, 73–74, 110. According to Schaeffer, Lockwood indicated FDDC had already been formed at this time. *Id.* 301. Lockwood had another separate entity, known as Four Diamonds Development Consulting, which did exist. *See id.* 219–20. Even after the Subdivision deal's structure changed, the parties continued to use the FDDC name in correspondence with the bank because they did not want "to let on to the bank that FDDC wasn't a -- wasn't a formed entity at the time" for fear Cecil Bank would have tried to "get out of the deal." *Id.* 119–20; *see also* JX 23; JX 24.

[25] JX 3 at 2; Tr. 220–21, 300, 360.

[26] JX 4.

Cecil Bank refused that offer.[27]  On June 5, O'Brien raised their bid, emailing Long as well as Schaeffer and Lockwood:

> John,[ ]spoke with Mark and Don.  You will have LOI for 265,500 on the above by tomorrow.  We will be ready to go to contract within 30 days as due diligence is almost complete and settle shortly after Cecil obtains Title.[28]

On June 10, Long emailed Schaeffer, indicating that the $265,500 offer was acceptable, that Cecil would not shop the offer, and that Cecil was working toward finalizing the transaction.[29]

With those assurances, the parties began their venture.  Lockwood suggested they use an LLC.[30]  On June 22, Lockwood emailed O'Brien and Schaeffer:

> John can u set up new llc with you Mark and myself as 33% partners. I think we should call it deep Branchwoods LLC if the name is available.[31]

O'Brien and Schaeffer understood from this message that the three would be equal, one-third members in a new entity and that the new entity would purchase the Subdivision.[32]  But O'Brien never formed any such entity.[33]  With trademark

---

[27] Tr. 16, 222.

[28] JX 5 at 2.  I have reproduced the parties' correspondence in its original form, only altering it where absolutely necessary for readability.

[29] JX 12 at 2.

[30] *See* Tr. 13, 301, JX 6.

[31] JX 6.

[32] *See* Tr. 13, 303.

[33] *See id.* 16–17, 223, 358–59.

informality,[34] Schaeffer, Lockwood, and O'Brien never drafted a written LLC agreement on these or any other terms.

Schaeffer prepared the venture to begin building as soon as the sale closed. He ensured the necessary approvals were in place, protected existing approvals, and pulled together existing engineering documents; these efforts required him to speak with contractors who had worked on the Subdivision, as well as County officials.[35] He also did a title search on the Subdivision and sent the results to Lockwood and O'Brien.[36]

On September 15, Bob Galoubandi, counsel for Cecil Bank, sent Long a proposed sales contract, which Long forwarded to Schaeffer.[37] Per the terms of that proposal, FDDC would purchase the Subdivision for $265,500,[38] with closing set for September 28 to allow time for Cecil Bank to obtain a deed.[39]

---

[34] *See* Tr. 71–72, 77, 95 (discussing the informality of the parties' business dealings); *see also* Tr. 216, 262, 320 (describing the parties' business relationship as "fluid").

[35] *See* Tr. 312–17; *see also* Tr. 22–23.

[36] *See* JX 10 at 1, 253.

[37] JX 9 at 1, 213.

[38] The proposed agreement reads: "The purchase price for the [Subdivision] shall be Two Hundred Forty [sic] Thousand Dollars ($265,000.00)." JX 9 at 2. It appears this was a mistake, and Long emailed Schaeffer and Galoubandi the next day to correct it. JX 15 at 90. The exhibit the parties submitted did not have this correction, but Schaeffer responded to Long's email indicating his version listed $265,500. *Id.* at 90, 92.

[39] JX 9 at 2–3.

Schaeffer, Lockwood, and O'Brien did not have the cash to fund the Subdivision project.[40]

## B. Cecil Bank Receives A Higher Offer And Lockwood Enlists Legal Help.

After the September 15 proposal, Cecil Bank received an "unsolicited" higher offer on the Subdivision from Insight Homes and thereafter attempted to renegotiate the terms of the deal.[41] Lockwood recruited Constantine Malmberg, a local attorney who also had a series of business partnerships with Lockwood, to "rattl[e] the saber"[42] and hold Cecil Bank to its original price. Lockwood and Malmberg also discussed Malmberg joining the Subdivision project as an investor, which he eventually did.[43]

Malmberg's entrance into the Subdivision project marked a major shift in the relationship among O'Brien, Schaeffer, and Lockwood. Malmberg has a positive relationship with Lockwood, and his brother Peter works for Lockwood's construction company.[44] While Malmberg and Schaeffer used to be business partners, they have not spoken to each other in a decade and have been hostile to

---

[40] *E.g.*, Tr. 23, 86, 367–68, 380.

[41] JX 11; *see* Tr. 18–19, 75–76; *see also id.* 224, 306.

[42] *Id.* 109.

[43] *See id.* 28, 107–08, 224–26; JX 10 at 1.

[44] *See, e.g.*, Tr. 96. This opinion refers to Peter Malmberg by his full name to distinguish him from Constantine Malmberg.

each other for quite some time predating this case.[45]  Malmberg insisted he would not participate in any business deal with Schaeffer.[46]

Though Lockwood recruited Malmberg, Schaeffer and O'Brien continued to pursue the Subdivision.  On September 21, O'Brien emailed Long, copying Schaeffer and Lockwood, with a "revised offer" for $420,000, with $265,500 payable at settlement, and the remainder paid in installments.[47]  Long responded later that afternoon, advising that Cecil Bank was "going to accept an all-cash deal in the high 3's" from an unsolicited bidder, but would "circle back" to O'Brien, Schaeffer, and Lockwood "if this falls out."[48]

---

[45] *See, e.g.*, *id.* 132.  Both men were conspicuously guarded about their feud.  Malmberg and Schaeffer have known one another for approximately fifty years.  *Compare id.* 310, *with id.* 107.  Malmberg knows Schaeffer's wife, Ruby, and speaks with her regularly.  *See id.* 132, 161–62, 201; *see also id.* 370 (Schaeffer testifying he "did not talk to Conny Malmberg, no.  Conny Malmberg and I had a personal falling out, and we do not speak.  He speaks to my wife a couple times a week.").

[46] *See, e.g.*, *id.* 123 ("I don't deal with Mr. Schaeffer"); *id.* 126 ("Q.  You claimed that you weren't going to enter into any agreements with Mark Schaeffer; isn't that true?  A. Correct.  I will not. . . . Q.  Okay.  And you state in your email to Mr. Lockwood, 'Not entering into any agreement or borrowing any money as a co-obligor with Mark.'  You're referring to Mark Schaeffer; correct?  A.  Yes, I am."), *id.* 146 ("But I was bristling at him even emailing me, because I don't deal with Mark Schaeffer."); *see also id.* 152, 163, 185–86 (discussing Malmberg's desire to not be involved with any arrangement between Lockwood, O'Brien, and Schaeffer).

[47] JX 11; JX 15 at 94.

[48] JX 11; JX 15 at 95.

10

Schaeffer continued to pursue the project for Lockwood. On September 22, he emailed Long threatening litigation, purportedly on behalf of Lockwood alone.[49] He emailed Long again the next day on behalf of Lockwood and "his attorney, [Malmberg]."[50]

At this point, Malmberg became involved, and engaged in substantial back-and-forth with Galoubandi. Malmberg testified he was serving as counsel for Lockwood, but not for Schaeffer or O'Brien.[51] Galoubandi sparred with Malmberg, and at times Lockwood, over whether Long had committed Cecil Bank to sell the Subdivision for $265,500.[52] Between themselves, Lockwood and Malmberg discussed whether and how they could enforce that alleged contract. In reference to filing a lawsuit, Malmberg wrote to Lockwood:

> You would have to have a winner case. Apparently FDDC, LLC does not even exist. If the intention is to file it will have to be as individuals trading as FDDC, LLC. I am not "in" and not yet decided on any interest in filing.[53]

---

[49] JX 15 at 96 ("Per our conversation yesterday, you were giving me until this morning to speak with Don Lockwood regarding his purchase of the [Subdivision]. I spoke with Don. I was unaware that he had already signed your contract and has delivered it to the escrow agent. He asked me to inform you that if Cecil Bank does not honor the contract they sent him for the sale of [the Subdivision] that his attorney will be filing an action in Chancery Court today to prevent the transfer of title to a third party. Please let me know the banks position as Don would like to purchase this property.").

[50] JX 16.

[51] *See* Tr. 182–83; *see also id.* 224. Malmberg also served as Lockwood's attorney on other matters. *See id.* 76, 173, 181.

[52] *See, e.g.*, JX 18 at 1–5.

[53] JX 14 at 1.

11

Eventually, Lockwood, Malmberg, and Long settled on a $390,000 purchase price. Lockwood emailed Malmberg, Long, and Galoubandi on September 24:

> Mr Malmberg, it is my understanding that Mr. Galoubandi has proposed that I deposit 30k non Refundable and the balance of 360k by the end of the month and the [Subdivision] would be sold to my group. Are these terms acceptable to purchase the project; Please confirm ?[54]

Though the parties continued to negotiate over price, they ultimately settled on $390,000.[55] Schaeffer "left it up to [Lockwood and O'Brien] to come up with the funding," though he understood neither had the money themselves.[56]

### C. Lockwood And Malmberg Form A New Entity, Secure Funding, And Purchase The Subdivision.

Around September 28, in a series of steps, Lockwood turned from O'Brien and Schaeffer to Malmberg; formed a new entity with Malmberg called Deep Branch Creek, LLC ("DBC"); and used that entity to secure financing and purchase the Subdivision.

Malmberg formed DBC and filed DBC's certificate of formation with the Delaware Secretary of State, listing himself as DBC's registered agent and his law office as DBC's registered office.[57] Malmberg emailed Lockwood an LLC

---

[54] JX 17 at 4.

[55] *See* JX 24 at 2.

[56] Tr. 367–69.

[57] JX 20.

agreement for DBC, with the message: "LLC agreement. You 70% me 30%. Please review and sign and send if all good."[58] The agreement listed Malmberg and Lockwood as DBC's sole members, with Malmberg holding 30% and Lockwood holding 70%.[59] The "capital contribution" line for both Malmberg and Lockwood was left blank.[60] Schaeffer and O'Brien were not mentioned in DBC's LLC agreement.

Malmberg also sent Lockwood a conflict waiver because Lockwood was Malmberg's client.[61] In the waiver, Lockwood acknowledged Malmberg was taking an interest in the Subdivision project while simultaneously advising Lockwood on the same.[62] There are not conflict waivers in the record for Schaeffer or O'Brien, consistent with the fact that Malmberg represented Lockwood personally, and Lockwood alone.[63]

With DBC formed, Lockwood and Malmberg finalized their purchase of the Subdivision. On the morning of September 28, Malmberg and Galoubandi exchanged emails to finalize the agreement and schedule closing.[64] Malmberg

---

[58] JX 25 at 1.

[59] *Id.* at 35; JX 26 at 34.

[60] JX 25 at 35; JX 26 at 34.

[61] JX 21 at 1–3.

[62] JX 21 at 3.

[63] *See, e.g.*, Tr. 182–83.

[64] *See* JX 22 at 1–4.

suggested, and Galoubandi prepared, an addendum to the purchase agreement, reflecting that DBC would purchase the Subdivision instead of FDDC.[65] The addendum assigned FDDC's rights in the Subdivision to DBC.[66] Malmberg forwarded it to Lockwood later that afternoon, instructing him to sign on behalf of both FDDC and DBC and "send back ASAP."[67] Ultimately, DBC purchased the Subdivision on $390,000, with $280,000 to be paid at closing, scheduled for September 29.[68] The parties closed that day and executed a deed transferring the Subdivision to DBC.[69]

To finance the purchase of the Subdivision, DBC relied on a loan from Dian Stein, a mutual friend and local short-term lender. O'Brien brought Stein to the table, and he and Lockwood together negotiated with Stein to secure a short-term loan of $350,000.[70] That loan was also finalized around September 28. That afternoon, Lockwood emailed Stein and O'Brien a draft loan agreement, and asked them to review it and call him.[71] Under the terms of that agreement, Stein, through

---

[65] JX 22 at 2–3; JX 24.

[66] JX 24 § 2; *see also* Tr. 231.

[67] JX 23 at 1.

[68] *See* JX 22 at 2.

[69] JX 29; D.I. 42 ¶ 9.

[70] *See* Tr. 23–24, 367, 376; JX 19 at 1. O'Brien and Lockwood both boasted about their relationship with Stein and took credit for recruiting her. *See* Tr. 23–24 (O'Brien); *id.* 280–83 (Lockwood).

[71] JX 19 at 1–5.

a trust, agreed to loan DBC $350,000.[72] The loan was secured by a mortgage on the Subdivision and had to be repaid by January 1, 2016—little more than ninety days later.[73] DBC also executed a $50,000 promissory note, payable to Stein's trust by January 1, 2016, as further consideration for the loan.[74] Lockwood was personally liable on the promissory note.[75] Thus, DBC obtained the cash needed to purchase the Subdivision on the bank's tight timeline, but DBC was obliged to repay Stein $400,000 by January 1, 2016.[76] The final loan documents were signed on September 30, after DBC closed on the Subdivision.[77] DBC used the loan from Stein to pay the majority of the Subdivision's purchase price. Malmberg covered the balance.[78]

### D. DBC Begins Developing The Subdivision And Secures New Funding; Malmberg And Lockwood Reorganize The Venture.

After closing, the parties got to work developing the Subdivision. On October 8, Jeff Clark, a landscape architect who worked with the Subdivision's former owner, emailed Peter Malmberg, Lockwood, and Schaeffer: "Pete, I understand that

---

[72] *Id.* at 2.

[73] *See id.*

[74] *See generally* JX 30.

[75] *See id.* at 1–4; *see also* Tr. 239.

[76] *See* JX 19 at 2–5; JX 30 at 1–8.

[77] JX 30 at 8.

[78] *See* Tr. 187.

the Deep Branch Woods site is now owned by Don Lockwood, Mark Schaeffer et al. We look forward to working with your team. As always, if you have questions, please contact me."[79] Clark attached several documents, including approvals and deeds.[80]

During this time, the Subdivision faced the possibility that the County would "sunset" the project, which would have required the parties to restart the approval process.[81] Schaeffer worked to ensure the parties had completed enough work on the Subdivision to avoid this outcome.[82] Clark directed Schaeffer to the relevant County officials and Schaeffer spoke with them, compiling a "paper trail" to document the Subdivision's progress.[83]

DBC also secured a real estate agent to list completed lots in the Subdivision. On October 8, DBC entered into an exclusive listing agreement (the "Listing Agreement") with Berkshire Hathaway HomeService Gallo Realty ("Gallo Realty").[84] Both Schaeffer and his wife, Ruby Schaeffer, worked at Gallo Realty, and Ruby Schaeffer was designated on the Listing Agreement as the exclusive listing

---

[79] JX 31.

[80] *Id.*; Tr. 322–23.

[81] Tr. 296–97; *see also id.* 313–15.

[82] *Id.* 313–14.

[83] *Id.* 314–15. Schaeffer testified that this was an ongoing process, *id.* 315, though it does not appear to have been full-time work.

[84] JX 32.

16

agent, with the promise of a stake of Gallo Realty's 8% commission on each lot.[85]

Lockwood and Malmberg testified they chose Ruby Schaeffer as the listing agent as "compensation" for Schaeffer's role in the Subdivision, though Schaeffer did not assent to such a structure, and the parties' subsequent dealings indicated Schaeffer remained uncompensated even after Ruby Schaeffer got the listing.[86]  The Listing Agreement also set list prices for certain lots:  $89,900 for ten lots and $104,900 for the remaining sixteen lots.[87]

Meanwhile, Malmberg and Lockwood were facing a funding crunch.  The deadline to repay Stein's was fast approaching, and DBC needed funds to pay for the Subdivision's construction.[88]  Neither DBC nor its members, Malmberg and Lockwood, could foot the bill.  Lockwood approached several banks, but his financial troubles precluded a loan.[89]  On November 20, a representative from Applied Bank emailed Lockwood asking for certain financial statements from Malmberg:  "In regard to Deep Branch please ask Conny [Malmberg] to send me the

---

[85] JX 32 at 1, 5; Tr. 372.  This opinion refers to Ruby Schaeffer by her full name to distinguish her from Mark Schaeffer.

[86] *See* Tr. 242, 285.  Schaeffer denied that this was the result of any agreement between the parties, calling it "absolutely ridiculous to suggest" Ruby Schaeffer's commission would be compensation for his work on the Subdivision.  *Id.* 324.

[87] JX 32 at 1.

[88] *See* Tr. 85, 233–34; JX 30 at 1.

[89] Tr. 130, 194.

following, i did send this out to him when I ask for yours and Mark [Schaeffer's]."[90]

Lockwood forwarded the message to Malmberg, who responded, "[n]ot entering into any agreement nor borrowing any money as a co-obligor with Mark."[91]

Eventually, Malmberg approached the loan committee chairman at MidCoast Bank, with whom he had worked before.[92] But MidCoast Bank was not willing to loan to an entity owned by Lockwood and would only loan to DBC if Malmberg was the sole owner.[93] MidCoast Bank also required a takedown agreement, which is essentially an installment sales contract on a development's lots that obliges a home builder to purchase a certain amount of lots at set prices on a set timeline, assuring the bank that lots would be sold and the developer would be able to repay the loan.[94]

Schaeffer pursued a takedown agreement and was ultimately responsible for bringing a developer to the table to make a deal.[95] Schaeffer approached Scott Dailey, the managing partner of a development company called Statera LLC.[96] On

---

[90] JX 33 at 2.

[91] *Id.* at 1.

[92] Malmberg's business partner and connection at MidCoast Bank was Ron Schaeffer, who was well-acquainted with, but not related to, plaintiff Mark Schaeffer. *See* Tr. 320. Malmberg was also an initial investor in MidCoast Bank and had borrowed money from MidCoast Bank before. *See id.* 130–31.

[93] *Id.* 194, 236. According to Malmberg, Lockwood "had some remnant issues as a builder that came out of the big crash" and made it difficult for him to get a loan. *Id.* 194.

[94] *See id.* 29–30, 33, 200–01, 236–37; *see also id.* 142–43; JX 44 at 1.

[95] *Id.* 142.

[96] *See id.* 327.

November 30, Dailey sent Schaeffer a letter of intent to purchase up to eighteen lots in the Subdivision for between $72,000 and $92,000 per lot.[97] The letter was addressed to Schaeffer at his Gallo Realty office.[98] The draft purchase agreement attached to the letter listed DBC as the seller.[99] Schaeffer forwarded the message to Ruby Schaeffer and Lockwood, with the message "[l]et's meet him Wednesday [December 1.]"[100] On December 3, Schaeffer sent the takedown agreement to Lockwood, copying O'Brien, with the instruction "[s]ign this and get it back to me ASAP."[101] Lockwood responded by asking for a version Malmberg could edit so they could modify the agreement.[102] Schaeffer responded to Lockwood, copying O'Brien, Malmberg, and Peter Malmberg, encouraging them to take the deal: "[t]his buyer is more than interested he's ready to roll[.]"[103] Lockwood forwarded Statera's letter of intent to Malmberg and Peter Malmberg shortly thereafter, and the three men discussed it.[104]

---

[97] JX 34 at 12.

[98] *Id.* at 2.

[99] *Id.* at 3.

[100] *Id.* at 1.

[101] JX 35 at 2.

[102] *Id.*

[103] *Id.* at 1.

[104] JX 36.

Malmberg grew frustrated with the imbalance between his primary financial role and the presence of O'Brien and Schaeffer.[105] On December 17, Malmberg emailed Lockwood:

> When I got in, it was with the understanding that my fund investment would be minimal and short lived. Also, when I reduced my share to 30% it was because I was not going to deal with Obrien or Schaeffer as partners. I expected you to take care of them out of your 70%. In that regard, the 30% was not after development fees, other padding and add ons, etc. . . . [N]ow it appears I will be the sole borrower and sole funder of all improvements and the lone party at risk. At this point, if you like, You can take me out for my net investment with no negative feelings about it. I'm guessing Dian [Stein] would stay in under the right circumstances.[106]

Malmberg went on to propose alternative structures for their investment.[107] Malmberg forwarded the message to Peter Malmberg under separate cover.[108] Lockwood responded later that day, proposing a structure whereby Malmberg would receive upfront payments on the lots and Lockwood would keep the proceeds:[109]

---

[105] Malmberg explained he was "bristling at [Schaeffer] even emailing me, because I don't deal with Mark Schaeffer." Tr. 146.

[106] JX 37 at 1; JX 38 at 1.

[107] JX 37 at 1; JX 38 at 1–2.

[108] JX 37 at 1.

[109] JX 38 at 1.

What do you think of this ?

Average Lot net 85k +\-after all fees on hole sub division 2.2mill +/-  net

Get Mid to loan 1.1mill
And do a Take down to 26 lot release 45k per lot

U get 10k first 6 lots 60k
15k second 12        180k
20k next 8             160k
I get what's evers left from lot proceeds to LDC and will feed the wolfs

The "wolfs" were Schaeffer and O'Brien.[110]  Lockwood and Malmberg understood that any compensation for Schaeffer and O'Brien would be Lockwood's responsibility.

Lockwood and Malmberg thereafter agreed to restructure their investment in DBC with Malmberg as the sole owner.  This structure had several complementary benefits.  First, Malmberg's ownership satisfied MidCoast Bank, which then contributed new financing and relieved Lockwood of his personal liability on Stein's note.[111]  The new structure also insulated Malmberg from Schaeffer and O'Brien, with whom Malmberg refused to do business.

Lockwood agreed to surrender his 70% interest.[112]  In exchange, Lockwood and his construction company secured a construction management agreement (the

---

[110] Tr. 236; *see also id.* 129.

[111] *See id.* 194; JX 30 at 1–4.  Indeed, Lockwood assented to this structure in part because it helped relieve him of his personal liability on Stein's loan.  *See* Tr. 229, 235, 239.

[112] Tr. 238–39.

"Development Agreement"), wherein Lockwood's company would provide development and project management services on the Subdivision.[113] Under an attached incentive bonus addendum, Lockwood's company would receive $1,500 as a "project management fee" for every lot finished.[114] Malmberg, through DBC, then received a $12,500 per lot payment.[115] After paying creditors, capital contributions, and other debts, the net profit from the project would be split, 85% going to Lockwood, and the rest going to Malmberg through DBC.[116] Lockwood's Development Agreement was finalized on January 20, 2016.[117] Malmberg executed a new LLC agreement for DBC, reflecting his sole ownership, on January 1.[118]

---

[113] Tr. 238–41; *see generally* JX 41; JX 42.

[114] JX 42 § 1. Lockwood explained that the management fees supported his team working the project, which included Peter Malmberg. Tr. 239.

[115] *See* JX 42 § 2(c); Tr. 137–40 (resolving discrepancy).

[116] JX 42 § 2.

[117] JX 41 at 1; JX 42 at 1. In May 2016, Lockwood assigned the Development Agreement to another of his entities, known as Limitless Development Consulting LLC. JX 46; *see* JX 47. He testified that this was because in May 2016, his parents held a stake in his construction company and no longer wanted to be part of the Subdivision project. *See* Tr. 267–68.

[118] *See* JX 39; Tr. 131–32. I note that the record also includes an earlier LLC agreement for DBC, effective September 28, 2015, that indicates Malmberg was the 100% owner. *See* JX 27. There is also an "Assignment and Assumption of Limited Liability Company Interests and Resignation Agreement," with an "effective date" of September 28, 2015, assigning Lockwood's 70% interest to Malmberg. JX 48. Taking these documents at face value, it would appear that on a single day, September 28, Lockwood and Malmberg: (1) formed DBC; (2) executed an LLC agreement indicating Lockwood had a 70% interest in the entity; (3) executed an agreement assigning Lockwood's 70% interest to Malmberg; and (4) executed a new LLC agreement indicating Malmberg as the sole owner. Aside from being illogical, this bizarre string of transactions is inconsistent with the story the parties told in their testimony. Malmberg and Lockwood both testified that in connection

22

Throughout January and early February, Lockwood and Malmberg continued to negotiate a takedown agreement with Statera. The email exchanges during these negotiations included Dailey, Malmberg, Lockwood, and Lockwood's employees Peter Malmberg and Jen Biggs.[119] They do not include Schaeffer.

On February 16, Schaeffer emailed Malmberg, Lockwood, and O'Brien regarding unpaid debts owed to Clark. Malmberg responded to the group, indicating that "there is no construction funding until we have a signed takedown agreement" and encouraging the others to contribute money to pay Clark if they would like: "If any of the project beneficiaries would like to advance funds of their own that can get repaid from construction monies. I currently have 130k in."[120] Malmberg's reference to the "project beneficiaries" included Schaeffer and O'Brien.[121]

DBC and Statera closed their takedown agreement on February 29.[122] The final agreement obliged Statera to purchase twelve lots on a set schedule, with the

---

with their efforts to secure a loan from MidCoast Bank, Lockwood traded his interest in DBC in exchange for the Development Agreement in January 2016. Tr. 238–41; *see also* Tr. 33–34, 133–36. And so, despite the unexplained date discrepancy in some of the documents, I find Lockwood ceased holding an interest in DBC in January 2016, not in September 2015.

[119] *See* JX 40 at 1 (Biggs, Dailey, Lockwood); JX 43 at 1 (Biggs, Dailey, Malmberg, and Peter Malmberg). Peter Malmberg later forwarded some of these messages to O'Brien. JX 43 at 1.

[120] JX 44 at 1.

[121] Tr. 146.

[122] JX 45 at 25.

option to purchase six more lots.[123]  Malmberg signed as DBC's "sole member."[124]

Lockwood and Malmberg are both listed in the "Notices" section; Schaeffer is not

mentioned.[125]

When the dust settled, Malmberg was DBC's sole owner, Statera had signed

a takedown agreement, and Lockwood was no longer a member of DBC, holding

the Development Agreement instead.[126]  With this structure in place, DBC secured

a loan for approximately $1.1 million from MidCoast Bank.[127]  The first $400,000

was used to repay Stein; the balance was earmarked for construction in the

Subdivision.[128]

---

[123] *Id.* §§ 2(a), 2(b)(I)–(III).

[124] *Id.* at 25.

[125] *See id.* § 12.

[126] Despite these changes, the record includes a "personal financial statement" for Lockwood on a form from M&T Bank, dated October 5, 2016.  JX 49 at 1.  Among Lockwood's real estate assets, the form lists the Subdivision, with the notation "25%" in parenthesis.  *Id.* at 3.  It lists the Subdivision's present market value as of that date as $625,000, purportedly derived from an appraisal.  *Id.*  Lockwood maintains that he did not prepare this document, which he says was a draft, and that it was instead prepared by his accountant, without his knowledge or signature.  Tr. 245–47.  I am unable to tell whether the signature on the document is authentic.  Lockwood insists he did not see the document until his deposition and that O'Brien must have taken it out of the office.  *Id.* 246–47.  O'Brien did not testify on this subject.

[127] *See* Tr. 33, 91, 195, 238.  The loan documents from MidCoast Bank are not in the record and the testimony on when the loan actually closed is unclear.  O'Brien speculated it was at some point between December 2015 and February 2016; Malmberg suggested it was January or February 2016. *Id.* 33, 192, 196.  DBC was obliged to repay Stein on January 1, but did not restructure the entity until late January and did not secure a takedown agreement until late February.

[128] *E.g.*, *id.* 28–29, 32, 196.

## E. Development Stalls And Lockwood Tries To Arrange A "Buy Out" For Schaeffer And O'Brien.

Schaeffer and O'Brien remained at least tangentially involved with the project through 2016. Though there was an experienced contractor overseeing the Subdivision's construction, Schaeffer paid "almost . . . weekly" visits to the site, noting problems with landscaping and swales.[129] It does not appear he did so at anyone's direction or that his visits involved substantial work.

The Subdivision project stalled in late 2016. Statera fell behind on their promised lot purchases, leaving DBC without expected revenue.[130] At some point in 2016, Lockwood and Schaeffer stopped speaking, and O'Brien became the "conduit" between them.[131] Lockwood's relationship with O'Brien was also rocky.[132]

By 2017, only one lot had been sold and Lockwood was having second thoughts about the project.[133] On April 27, 2017, Malmberg emailed Lockwood "fast and dirty" estimates for Lockwood's profits under the Development Agreement

---

[129] *Id.* 328–30. Lockwood properly objected to, and I have ignored, Schaeffer's hearsay testimony in this portion of the transcript.

[130] *E.g.*, *id.* 176, 245, 248, 251.

[131] *Id.* 263.

[132] *E.g*, *id.* 255.

[133] *See* JX 54 at 2.

if all twenty-six lots sold.[134]  Malmberg estimated Lockwood would earn $39,000 from his $1,500 per lot "project management fee."[135]  Based on an estimated $90,000 per lot sales price, minus development costs and other expenses, Malmberg projected the Subdivision project would net around $692,500 in profits, entitling Lockwood to an 85% share, or $588,625.[136]  He concluded his message, "Hopefully this puts you in a possession to make some decisions."[137]

Around this time, Lockwood approached Jeff Garrison, the president of another home building company called Garrison Homes, LLC, to gauge his interest in "buy[ing] out" Schaeffer and O'Brien's interests in the Subdivision.[138]  Lockwood was looking to "get [himself] out of that whole situation"[139] with Schaeffer and O'Brien, given their souring relationship; in short, he was looking to appease them and "get[] them out of the deal and move forward."[140]  O'Brien and Schaeffer were both aware of Garrison's involvement and, by the time buyout discussions began, knew Malmberg was the sole owner of the Subdivision and that Lockwood only held

---

[134] *Id.* at 2–3.

[135] *Id.* at 2.

[136] *Id.* at 2–3.

[137] *Id.* at 3.

[138] JX 50; *see* Tr. 334.  Schaeffer explained he had discussions with Garrison about Garrison Homes building "spec houses" in the Subdivision and Lockwood later approached Garrison behind Schaeffer's back.  *Id.*

[139] Tr. 255.

[140] *Id.*

a profit interest.[141] Over the months that followed, Garrison and Lockwood negotiated a price for Garrison to buy out O'Brien and Schaeffer's interests, which Garrison eventually came to understand were a share of Lockwood's profits rather than an ownership stake.[142] The communications also support the continued treatment of O'Brien and Schaeffer as Lockwood's responsibility.[143]

Lockwood, Biggs, and O'Brien prepared a draft agreement, titled "Transfer of Profit Interest" (the "First Draft Release").[144] The First Draft Release read, in its entirety:

---

[141] *See, e.g.*, *id.* 59–60, 92–94. *But see id.* 46. Schaeffer insisted that at this point, he "didn't really know what that 85 percent really meant" and maintained that he owned 33% of the Subdivision. *Id.* 337, 383–86. I do not find his testimony credible on this point, given that he saw and perhaps helped prepare documents referencing Lockwood's profit interest, and given his pursuit of a share of Lockwood's profits. *See id.* 47, 100, 336. O'Brien, who worked in Lockwood's office, was aware that Malmberg owned DBC and Lockwood owned a profit interest. *See id.* 59; *see also id.* 81. It is not credible that O'Brien knew about Lockwood's interest but Schaeffer, who was working with O'Brien and Lockwood to negotiate a buyout involving that interest, somehow did not. *But see id.* 332.

[142] *See* JX 54 at 1. Garrison initially believed that in buying out O'Brien and Schaeffer, he was buying "50 percent ownership of the development." JX 50.

[143] *See* JX 54 at 1; *see also* JX 50 ("I do realize that this does not really benefit Conny or Don BUT . . . . I have no interest in dealing with the other 2 Dirt bags that I am buying out. If you want to pass this on to them thats fine BUT . . they have horrible reputations in the industry and I'm not dealing with them. So, if you want a better partner to go forward with I am your guy and your better off to keep this to yourself. If the deal doesn't pan out I still have 35 mil in custom homes this year to build and it won't hurt my feelings. Conny, you are a top notch guy and I have the utmost respect for you. Don, the same to you. This is a chicken shit deal and we can do tons together going forward." (ellipses in original)).

[144] Tr. 42; JX 52 at 2. It is unclear whether Schaeffer participated in drafting this document, though O'Brien testified Schaeffer prepared some version of a release. Tr. 100.

27

**Whereas**, Deep Branch Creek, LLC a Delaware limited liability company is the fee simple owner of 26 improved residential lots located off Route 5 Milton, Delaware and

**Whereas**, Deep Branch Creek, LLC hereinafter (DBC) and Lockwood Design & Construction hereinafter (LDC) did enter into an agreement dated January 20, 2016 for a Construction Management Agreement and improvements as to the aforesaid lots and

**Whereas**, pursuant to said agreement LDC was to receive a Construction Management fee and an additional fee of 85% of the Net profit from the sale of the aforesaid residential lots and

**Whereas**, pursuant to an agreement with LDC, John E. O'Brien hereinafter (JEO) and Mark G. Schaeffer hereinafter (MGS) were to respectfully receive an equal interest in the 85% profit or 28.33% each.

**Now therefor**, for and in consideration of the sum of One Dollar and other good and valuable consideration as set forth herein the undersigned parties do hereby agree as follows to wit

1. It is hereby agreed that MGS and JEO for and in consideration of the Sum Of $100,000 shall transfer their aforesaid share of 28.33% profit to Garrison Homes, Inc. as follows
   a. Garrison Homes, Inc. shall pay the sum of $50,000 each to JEO and MGS on or before May 2, 2017 which shall transfer ½ of the aforesaid profit interest or 14.16% each.
   b. Garrison Homes shall pay an additional sum of $50,000 each to JEO and MGS on or before June 2, 2017 which shall transfer the remaining ½ of the aforesaid profit interest
2. JEO and MGS do hereby release LDC from any and all obligations as to their respective share of the net profit.
3. This agreement may only be modified by the parties in writing.

4. This agreement is made pursuant to the laws of the State of Delaware.[145]

On May 1, Biggs sent it to Malmberg and O'Brien.[146] Schaeffer did not sign the First Draft Release.[147]

Later that afternoon, Biggs sent Malmberg a revised version (the "Second Draft Release").[148] This release did not mention Schaeffer and O'Brien, but instead contemplated Garrison would buy 50% of Lockwood's 85% profit interest from Lockwood for the same $200,000.[149] Biggs did not send the Second Draft Release to O'Brien.[150]

On May 2, Lockwood, Malmberg, and Garrison exchanged more emails about the Subdivision's development plan and its profit estimates.[151] Garrison asked Malmberg:

---

[145] JX 52 at 2.

[146] *Id.* at 1.

[147] *See id.* at 2; Tr. 336. O'Brien could not remember if he ever signed his, but it appears he did not. Tr. 100; JX 52 at 2.

[148] JX 53 at 12.

[149] *Id.* at 2.

[150] *Id.* at 1. *Cf.* JX 52 at 1 (copying O'Brien on the email sending the First Draft Release).

[151] *See* JX 54 at 13.

29

Conny, just a little further clarification. My 50 percent will be considered an investment and I am an "investor" not an "owner"? Please correct me if I'm wrong? If I am correct then you will be responsible for finaling out the subdivision with SDC, Deldot etc etc. is this correct? I'm just trying to continue to clarify and understand what I am buying and what my responsibilities are and are not.[152]

Malmberg responded:

By way of further answer. I own and am developing the subdivision and am selling lots. Dons company is acting as project manager and in return gets 1500 a lot and 85% of net profits after my investment the loan and a return on my investment is repaid. I am not now nor have I ever been involved in the arrangement between don and john and mark and frankly did not know of it until very recently. I am guessing [your attorney] will want some sort of partnership agreement between you and Don regarding spelling out the same.[153]

On May 3, Lockwood sent Malmberg and Garrison a signed version of the Second Draft Release.[154] On May 8, Malmberg explained to Kevin Baird, Garrison's attorney, that Garrison would purchase "50% of LDC's [Lockwood's] interest which is 85% of the net profit," attaching the Development Agreement and forwarding his April 27 projection email.[155] Baird responded: "That's what I thought too from the agreement. But I guess that's not what Don [Lockwood] was telling Jeff [Garrison]. I'll see what Jeff wants to do."[156] Malmberg answered: "I do not have a dog in the

---

[152] *Id.* at 1.

[153] *Id.*

[154] JX 55 at 13.

[155] JX 56 at 13.

[156] *Id.* at 1.

30

fight.  Don basically wants to get rid of John O'Brien and Mark Schaeffer as partners and replace with Jeff.  (Understandable plan) and they both need cash."[157]

Through late May and June, Lockwood, Malmberg, Garrison, and Baird continued to discuss Garrison's terms.[158]  Lockwood sent O'Brien and Schaeffer a third draft document, which recited that Lockwood's construction company "is entitled to 85% of the Net Profit" from selling lots in the Subdivision, that Schaeffer "is entitled to a percentage of that Net Profit," and that in exchange for $100,000, Schaeffer would "release all of his right title and interest in any and all Net Profit" to Lockwood's company.[159]  Schaeffer never signed this document, though Lockwood sent it to him with instructions to do so.[160]

Discussions between Lockwood and Garrison stalled, and Garrison backed out entirely on June 13.[161]  Malmberg forwarded Garrison's exit message to O'Brien, letting him know talks had ended.[162]

---

[157] *Id.*

[158] *Id.*; JX 57; JX 59; JX 60.

[159] JX 58 at 5.  Lockwood did not dispute that Schaeffer was "entitled to" a percentage of the Subdivision's profits.  *See* Tr. 253 ("Q.  In the draft release of net profit interest, it says, 'Whereas, Mark G. Schaeffer is entitled to a percentage of that Net Profit.'  Was that just not true?  He was not entitled to a percentage?  A.  He was entitled to a percentage at the end of the day, after the whole project was done.  I mean, I gave, you know, John O'Brien and Mark, if we make money, we'll disburse it.").

[160] JX 58 at 1.

[161] JX 60 at 1.

[162] *Id.*; Tr. 48.

Garrison's decision created a "dilemma" for O'Brien.[163] He needed cash and was counting on a buyout to help. On June 15, he emailed Malmberg, indicating he had interested buyers for his "interest," but those offers were contingent on the buyers striking a takedown agreement for the remaining lots.[164] O'Brien suggested per lot prices between $100,000 and $125,000.[165] Malmberg responded, "I would go lower to get them sold."[166]

### F. Lockwood Trades Malmberg His Profit Interest In The Subdivision; Schaeffer and O'Brien Confront Lockwood.

By late 2017, Lockwood and Malmberg were experiencing "partner fatigue" and Lockwood was looking for an exit.[167] The pair also had joint investments and unrelated debts in other business ventures, including Lockhaven Farm, LLC, which owned a 125-acre farm in Sussex County called Hoch Farm.[168] Lockwood's entity controlled two-thirds of the Hoch Farm project, while Malmberg's entity controlled the other third.[169] Malmberg and Lockwood began discussing a swap whereby Lockwood would exit the Subdivision project in exchange for consideration in other

---

[163] JX 61.

[164] *Id.*

[165] *Id.*

[166] *Id.*

[167] Tr. 203; *see also id.* 256–57.

[168] *See, e.g., id.* 163–64, 211–12.

[169] *Id.* 163–64; JX 62 at 35; JX 63 at 1.

projects.[170] On December 6, Malmberg sent Lockwood a lengthy email discussing a potential deal.[171] He wrote, "I do not know what your arrangements are with Mark [Schaeffer] and John [O'Brien] on DBW but you would need to work that out. Maybe give them my share of Riverwalk [another property] which I would relinquish for just a return of my 155k cash in."[172]

Lockwood and Malmberg eventually struck a deal. Lockwood agreed to release the Development Agreement and his associated interest in the Subdivision.[173] In exchange, Malmberg assigned his interest in Hoch Farm to Lockwood.[174] Their deal also included settling certain debts and other obligations associated with the Hoch Farm project; Lockwood paid Malmberg $500,000 in connection with these settlements.[175] Lockwood and Malmberg reduced their agreement to writing on December 21.[176]

Schaeffer and O'Brien were not privy to Malmberg and Lockwood's swap. O'Brien first learned about it in April 2018, during a phone call with Malmberg in a

---

[170] Tr. 165–68; JX 62 at 1; JX 63 at 1; *see also* JX 64; JX 65.

[171] *See* JX 63 at 1.

[172] *Id.*

[173] JX 64 at 1.

[174] JX 65 at 1.

[175] *Id.*; JX 66 at 2; Tr. 167, 180–81.

[176] JX 64 at 1; JX 65 at 1.

Wawa parking lot.[177]  At Malmberg's suggestion, O'Brien confronted Lockwood.[178]

Lockwood initially denied the transfer, but later admitted it.[179]  Lockwood then paid

O'Brien three checks, totaling $8,000, with the notation "DBW," as payment for

O'Brien's efforts in the Subdivision.[180]   This payment was consistent with

Lockwood and O'Brien's past dealings.[181]

Schaeffer learned of Lockwood's Hoch Farm swap from O'Brien and Ruby

Schaeffer.[182]  On April 11, Schaeffer emailed Lockwood, copying Ruby Schaeffer.

> Don it has come to my attention that you have unilaterally sold our joint
> ownership in Deepbranch Woods.  Please let me know when I can pick
> my check up.  Thanks[183]

---

[177] *See* Tr. 36–39, 52, 56, 59.  O'Brien and Malmberg testified inconsistently on this point. O'Brien variously suggested that he learned about not only the Hoch Farm swap, but also Lockwood's 85% profit interest during this conversation.  He initially had trouble remembering the correct year.  Malmberg suggested O'Brien learned about the Development Agreement before their April 2018 conversation.  *See id.* 171–72.  I have already concluded O'Brien and Schaeffer were aware of the Development Agreement by the time buyout conversations with Garrison were underway.  But O'Brien's testimony that he learned about the Hoch Farm transaction in April 2018 is both credible and supported by the record.

[178] *Id.* 36–37.

[179] *Id.* 37–39.

[180] *Id.* 38, 61, 285.

[181] *See id.* 173 ("And that was consistent with my understanding that in the history of Don and John's relationship, whereby John would assist Don with various projects, and Don would pay John 5 grand here, 10 grand there, depending upon the success or failure of the project.").

[182] *Id.* 38.

[183] JX 67 at 1.

Lockwood responded the next day, "I thought John told you that you will get your share profits as lots settle and conny [Malmberg] is paid off what he's taking."[184] Schaeffer replied, alluding to the Hoch Farm transaction, and asking to see written agreements with Malmberg.

> We understand from John Obrien that our interest in Deepbranch Woods was sold and a "farm" was acquired in the Milton area. If that information is not correct please let us know. Please forward us a copy of the contractual agreements we have with Conny Malmberg.[185]

Lockwood responded, "I never had any signed agreements."[186]

With Lockwood out of the picture, Malmberg eventually sold off the remaining lots in the Subdivision. Lockwood characterized this as a "fire sale."[187] Today, neither Lockwood nor Malmberg owns any interest in the Subdivision. Schaeffer's complaint followed on December 21, 2018.[188]

### G. After Litigation Begins, Lockwood Reaches Out To O'Brien About The Subdivision.

Litigation only fueled the parties' dispute, which spread to another venture among Lockwood, O'Brien, and Schaeffer. As background, Lockwood, Schaeffer, and O'Brien jointly own a Washington state cannabis farm through 222

---

[184] *Id.*

[185] JX 68 at 1.

[186] *Id.*

[187] Tr. 256–57.

[188] D.I. 1 [hereinafter "Compl."].

Enterprises.[189]  In June 2015, Lockwood sold 5% of his interest in the entity to Stein for $300,000.[190]  Lockwood planned to recoup part of his interest by purchasing 1.66% interests from Schaeffer and O'Brien for $100,000 each.[191]  O'Brien does not dispute that Lockwood paid him $100,000, but contends it was meant to cover outstanding consulting fees.[192]

As for Schaeffer, in August 2015 Lockwood's holding company wrote two checks to Schaeffer Management, a company Ruby Schaeffer owns:  one check for $51,190 for "Consulting," and one for $50,000.[193]  Lockwood contends these checks paid Schaeffer for a 1.66% interest in 222 Enterprises, but Schaeffer never transferred the interest.[194]  The record contains a bill of sale for such a transaction between Lockwood and Schaeffer, but Schaeffer did not sign it.[195]  Lockwood also explained that Ruby Schaeffer asked him to make out the checks to Schaeffer

---

[189] Tr. 53–54, 69, 271.

[190] *Id.* 53–54, 260–62.

[191] *Id.* 54, 260–62.

[192] *Id.* 55.

[193] JX 8 at12.

[194] Tr. 263–65.

[195] JX 7 at 12.

Management.[196]  Schaeffer disputes that these checks were for any interest in 222 Enterprises.[197]

On January 31, 2019, weeks after Schaeffer initiated this action, Lockwood saw an opportunity to arrange for global peace regarding both the Subdivision and 222 Enterprises.  He sent a message to O'Brien, referencing an earlier phone call.[198] Lockwood suggested redirecting the 2015 payments he made to O'Brien and Schaeffer Management to serve as satisfaction for any interest Schaeffer and O'Brien had in the Subdivision, and surrendering his claim for part of their stakes in 222 Enterprises.

> As you stated today on the call . . . you and Mark will retain you 12.5% and are not transferring 1.66% for the $100,000 you received from me as was agreed.  Plse acknowledge that is will serve as all compensation for any potential profits from deep branch.  I will be sending a similar email to Mark Schaffer as his interest has not reflected him transferring 1.66% to me for the $100,000 he received from me.[199]

---

[196] Tr. 263–64.

[197] *E.g.*, *id.* 340–41.

[198] JX 71.

[199] *Id.*

The record does not include any response from O'Brien, nor does it include a similar message to Schaeffer.

## H.    This Litigation

On December 21, 2018, Schaeffer filed his Verified Complaint in this action (the "Complaint").[200]  The Complaint asserts five causes of action.  Counts I through III, for "specific performance," breach of contract, and breach of the implied covenant of good faith and fair dealing, are based in Schaeffer's view that he and Lockwood had a contract related to his interest in the Subdivision.[201]  Counts IV and V assert quasi-contract claims for promissory estoppel and unjust enrichment.[202] Lockwood answered the Complaint on February 4, 2019, asserting a counterclaim against Schaeffer for failing to transfer the 1.66% interest in 222 Enterprises.[203] After discovery and an ill-fated attempt at summary judgment,[204] the parties proceeded towards trial, which was rescheduled multiple times.[205]  This matter was

---

[200] *See generally* Compl.

[201] *See id.* ¶¶ 27–40.

[202] *See id.* ¶¶ 41–49.

[203] *See* D.I. 6.

[204] *See, e.g.*, D.I. 26; D.I. 27; D.I. 28; D.I. 33; D.I. 34.

[205] *E.g.*, D.I. 36; D.I. 45; D.I. 47.

tried on February 9 and 10, 2021.[206]  The parties completed their post-trial briefs and I took this matter under advisement on July 2.[207]

## II. ANALYSIS

The parties have the burden of proving their respective claims at trial by a preponderance of the evidence.[208]  "Proof by a preponderance of the evidence means proof that something is more likely than not."[209]  This "means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than not.  By implication, the preponderance of the evidence standard also means that if the evidence is in equipoise, Plaintiffs lose."[210]

Schaeffer seeks a share of the Subdivision or its profits.  Nobody involved in the project—including Lockwood—meaningfully disputes Schaeffer's involvement with the Subdivision or his entitlement to some payment as a result.  Indeed, Lockwood has consistently recognized, both before and after this litigation began,

---

[206] D.I .56.

[207] D.I. 69.

[208] *Martin v. Med-Dev Corp.*, 2015 WL 6472597, at *10 (Del. Ch. Oct. 27, 2015).

[209] *Id.* (quoting *Agilent Techs., Inc. v. Kirkland*, 2010 WL 610725, at *13 (Del. Ch. Feb. 18, 2010)).

[210] *Id.* (internal quotation marks and footnotes omitted) (quoting *Agilent Techs.*, 2010 WL 610725, at *13, and then quoting *OptimisCorp v. Waite*, 2015 WL 5147038, at *55 (Del. Ch. Aug. 26, 2015)).

that Schaeffer is entitled to some compensation for his efforts on the Subdivision project.

Schaeffer advances three broad legal theories to capture this essentially undisputed payment. Only one fits the facts. He primarily argues that he, O'Brien, and Lockwood struck an oral agreement to split the Subdivision's profits equally. Schaeffer failed to make that showing by a preponderance of the evidence, dooming his contract-based claims. He also failed to establish promissory estoppel by clear and convincing evidence. But Schaeffer has proven the elements of unjust enrichment and is entitled to a remedy under that theory.

### A. Schaeffer Has Not Proven A Contract.

Schaeffer's claims in Counts I, II, and III depend on the existence of a contract. He attempts to support these claims by showing he and Lockwood were parties to an oral contract. Whether an oral contract exists is a question of fact.[211] "Under Delaware law, a party asserting a breach of an oral agreement must prove the existence of an enforceable contract by a preponderance of the evidence. Where a party seeks an award of specific performance, however, the burden of proof is clear

---

[211] *E.g.*, *Cole v. State*, 922 A.2d 354, 359 (Del. 2005) (citing *Wheeler v. Clerkin*, 871 A.2d 1129 (Del. 2005) (TABLE), and *Philips Bros. Elec. Contrs., Inc. v. Great Am. Ins. Co.*, 133 Fed. Appx. 815, 816 (3d Cir. 2005)). *Cf. Eagle Force Hldgs., LLC v. Campbell*, 187 A.3d 1209, 1213 (Del. 2018) (noting the parties' "inten[t] to be bound . . . is a question of fact," but "whether the contract's terms are sufficiently definite[] is largely a question of law").

and convincing evidence."[212]   Schaeffer has failed to meet the more lenient

preponderance of the evidence standard.

Under Delaware law, "the formation of a contract requires a bargain in which

there is a manifestation of mutual assent to the exchange and a consideration."[213]   A

valid contract exists only if "the parties have manifested mutual assent to be bound

by that bargain."[214]   Parties may be bound by an oral or written agreement only where

"evidence reveals manifestations of assent that are in themselves sufficient to

conclude a contract."[215]

"[M]anifestation of mutual assent is an external or objective standard for

interpreting conduct."[216]   A party "manifests an intention [to be bound] if he believes

or has reason to believe that the promisee will infer that intention from his words or

---

[212] *Pulieri v. Boardwalk Props., LLC*, 2015 WL 691449, at \*5 (Del. Ch. Feb. 18, 2015) (footnote omitted) (citing *Grunstein v. Silva*, 2014 WL 4473641, at \*16 (Del. Ch. Sept. 5, 2014) *aff'd*, 113 A.3d 1080 (Del. 2015) (ORDER)).

[213] *Sarissa Cap. Domestic Fund LP v. Innoviva, Inc.*, 2017 WL 6209597, at \*21 (Del. Ch. Dec. 8, 2017) (quoting *Wood v. State*, 2003 WL 168455, at \*2 (Del. Jan. 23, 2003) (ORDER)); *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) ("[A] valid contract exists when (1) the parties intended that the contract would bind them, (2) the terms of the contract are sufficiently definite, and (3) the parties exchange legal consideration." (citing *Carlson v. Hallinan*, 925 A.2d 506, 524 (Del. Ch. 2006))).

[214] *Innoviva*, 2017 WL 6209597, at \*21 (citing *Osborn*, 991 A.2d at 1158).

[215] *Id.* (alterations and internal quotation marks omitted) (quoting *Loppert v. WindsorTech, Inc.*, 865 A.2d 1282, 1288 (Del. Ch. 2004)).

[216] *Chemours Co. v. DowDuPont Inc.*, 2020 WL 1527783, at \*10 n.130 (Del. Ch. Mar. 30, 2020) (internal quotation marks omitted) (quoting Restatement (Second) of Contracts § 2 cmt. b (1981)).

conduct."[217] Mutual assent "means the external expression of intention as distinguished from undisclosed intention."[218] The Court determines whether there has been mutual assent "based upon [the parties'] expressed words and deeds as manifested at the time rather than by their after-the-fact professed subjective intent."[219]

"A contract must contain all material terms in order to be enforceable, and specific performance will only be granted when an agreement is clear and definite and a court does not need to supply essential contract terms."[220] Even if the parties agree to be bound, "where the[y] fail to agree on one or more essential terms, there is no binding contract."[221] Thus, the "relevant inquiry" is

> whether a reasonable negotiator in the position of one asserting the existence of a contract would have concluded, in that setting, that the agreement reached constituted agreement on all of the terms that the parties themselves regarded as essential and thus that agreement concluded the negotiations.[222]

---

[217] Restatement (Second) of Contracts § 2 cmt. b (1981).

[218] *Id.*

[219] *Innoviva*, 2017 WL 6209597, at *21 (alterations omitted) (quoting *Debbs v. Berman*, 1986 WL 1243, at *7 (Del. Ch. Jan. 29, 1986)).

[220] *Osborn*, 991 A.2d at 1159 (alterations and internal quotation marks removed) (quoting *Ramone v. Lang*, 2006 WL 905347, at *10 (Del. Ch. Apr. 3, 2006)); *see also Eagle Force*, 187 A.3d at 1229–30.

[221] *Patel v. Patel*, 2009 WL 427977, at *3 (Del. Super. Feb. 20, 2009) (citing *Corbin on Contracts* § 30 (1963)).

[222] *Innoviva*, 2017 WL 6209597, at *21 (alterations omitted) (quoting *Leeds v. First Allied Conn. Corp.*, 521 A.2d 1095, 1097 (Del. Ch. 1986)); *see Harrison v. Dixon*, 2013 WL 4759681, at *2 (Del. Ch. Sept. 5, 2013) (MASTER'S REPORT) (quoting *Loppert*, 865 A.2d at 1285); *see also* Restatement (Second) of Contracts § 2 (1981).

"Where the objective, contemporaneous evidence indicates that the parties have reached an agreement, they are bound by it, regardless of its form or the manner in which it was manifested."[223] With these principles in mind, I consider the factual question of whether Schaeffer has proved a contract by a preponderance of the evidence. I find he has not.

Schaeffer argues that in 2015, he, Lockwood, and O'Brien orally agreed to split the Subdivision's net profits in equal one-third shares.[224] He relies on an eleven-item list of circumstantial evidence, including emails between the trio, statements by Lockwood and Malmberg, buyout discussions with Garrison, and other after-the-fact comments.[225] But the evidence that Schaeffer, Lockwood, and O'Brien agreed to be equal partners in 2015 is thin. The strongest piece of evidence is Lockwood's June 2015 email to O'Brien and Schaeffer, asking O'Brien to set up an LLC called "deep Branchwoods LLC" with the three as "33% partners."[226] But

---

[223] *Innoviva*, 2017 WL 620597, at \*21 (quoting *Debbs*, 1986 WL 1243, at \*); *see also* Restatement (Second) of Contracts §§ 18, 19 (noting that party may assent by conduct, rather than words, promise, or performance). In making that determination, I consider "all of the surrounding circumstances, including the course and substance of the negotiations, prior dealings between the parties, customary practices in the trade or business involved and the formality and completeness of the document (if there is a document) that is asserted as culminating and concluding the negotiations." *Leeds*, 521 A.2d at 1102.

[224] *See* D.I. 62 at 1.

[225] *See id.* at 20–22; D.I. 66 at 9–11.

[226] JX 6.

O'Brien and Schaeffer understood this message as proposing a joint venture in an entity purchasing the Subdivision, not each taking an equal share of profits while someone else owned the Subdivision.[227]

More fundamentally, O'Brien and Schaeffer both admit they did not follow through on this arrangement. Neither man responded to the message. And O'Brien never formed the entity Lockwood mentioned.[228] When Malmberg and Lockwood formed DBC, Schaeffer and O'Brien never objected. In fact, O'Brien testified that he and Schaeffer "were never to be owners in the entity" because "[t]hat was Conny [Malmberg]'s deal" and that he and Schaeffer were, instead, "always [going] to get just a profit share."[229] Without evidence of an "outward, objective manifestation[]

---

[227] *See* Tr. 13 ("So it was my [O'Brien's] understanding -- and I think it's evidenced by an email that Don sent to me -- that, you know, we would all have an equal -- some type of equal interest in the property, one-third, one-third, one-third. And I believe at one time he asked me to go ahead online and create an LLC, you know, reflecting that Mark, he, and myself each had a one-third equal interest."); *id.* 303 ("Q. . . . Who, to your understanding, would be ready to go to contract? A. John, myself [Schaeffer], and Don Lockwood. John O'Brien, myself, and Don Lockwood. Q. Okay. Was there any discussion about how the project would be shared, if any? A. Yeah. We had extensive discussions. It was -- we were all going to be equal partners, 33 percent split. Q. Okay. Let's go to JX 6, please. There is an email from Don Lockwood to John O'Brien and Mark Schaeffer. Can you take a look at that and see if you recognize that. A. Yeah. That's Don Lockwood asking John O'Brien to make sure that he got the LLC together, putting us in each as 33 percent partners in the Deep Branch Woods subdivision."). Schaeffer doubled down on his argument that the parties agreed to form an LLC in an attempt to overcome Lockwood's statute of frauds defense. *See* D.I. 66 at 13–14. I do not reach the issue of whether an oral agreement would be enforceable here, as I find the parties never reached such an agreement in the first place.

[228] *See* Tr. 16 17, 223, 358–59.

[229] *See* Tr. 81 ("My understanding of the deal was always, is that -- and this, I think, is evidenced from the emails and the conduct, you know, that we had amongst us -- was that Mark, myself, and Don were always to get just a profit share. We were never to be owners

of assent," I cannot conclude the parties reached an agreement on the terms of Lockwood's June 2015 email.[230]  A reasonable negotiator in Schaeffer's position would not have concluded this unilateral email constituted the end of discussions between the parties.[231]

Beyond that initial email, Schaeffer seizes on several other "admissions" by Lockwood that evidence a decision to go into business together, but are too vague and varying to serve as contractual terms.[232]  "Where terms in an agreement are so vague that a Court cannot determine the existence of a breach, then the parties have not reached a meeting of the minds, and a Court should deny the existence of the alleged agreement."[233]  For example, Schaeffer relies on a document disclosing Lockwood's interest in the Subdivision; that document reflects Lockwood owned

---

in the entity.  That was Conny's deal.  That was part of his participation for getting his interest in the deal, was that he was going to arrange for the financing, and in return for that, we were going to put him in the deal as an equal partner.").

[230] *See Eagle Force*, 187 A.3d at 1230 n.143 ("Since the formation of informal contracts depends not upon an actual subjective meeting of the minds, but instead upon outward, objective manifestations of assent, an actual intention to accept is unimportant except in those situations when the acts or words of the offeree are ambiguous." (alteration and internal quotation marks omitted) (quoting 2 *Williston on Contracts* § 6:3 (4th ed.))).

[231] *See Innoviva*, 2017 WL 6209597, at *21; *see also Leeds*, 521 A.2d at 1102 ("Until it is reasonable to conclude, in light of all of these surrounding circumstances, that all of the points that the parties themselves regard as essential have been expressly or (through prior practice or commercial custom) implicitly resolved, the parties have not finished their negotiations and have not formed a contract.").

[232] *See* D.I. 61 at 23; D.I. 66 at 2.

[233] *Eagle Force*, 187 A.3d at 1232 n.160 (internal quotation marks omitted) (quoting *Cont'l Ins. Co. v. Rutledge & Co., Inc.*, 750 A.2d 1219, 1230 (Del. Ch. 2000)).

25%, not 33%.[234]  He also points to Lockwood's conversations with Garrison about Garrison "buy[ing] out" a 50% interest held by Schaeffer and O'Brien for $100,000 each.[235]  Lockwood later corrected Garrison that Schaeffer and O'Brien each held an "equal interest" in his 85% profit share, or approximately 28.33% profit interests.[236]  As time passed, the descriptions about Schaeffer's stake became more vague.  Malmberg generally referenced Lockwood trying to "get rid of John O'Brien and Mark Schaeffer as partners."[237]  In 2017 and 2018, Lockwood referenced O'Brien and Schaeffer being broadly entitled to "a percentage"[238] or his "share profits."[239]

These statements support the conclusion that the parties had some kind of arrangement, and that Lockwood understood Schaeffer deserved something in recognition of his "bird-dogging" efforts.  The men may have considered themselves "partners," at least in the colloquial sense.[240]  But Schaeffer, Lockwood, and O'Brien

---

[234] *See* JX 49 at 3; *see also* Tr. 245–47.

[235] *See* JX 50.

[236] JX 52 at 2.

[237] JX 56.

[238] JX 58 at 5.

[239] JX 68 at 2.

[240] Schaeffer has not presented any argument that the trio formed a common law partnership.  *Cf. Jackson v. Nocks*, 2018 WL 1935961, at *4–5 (Del. Ch. Apr. 24, 2018) (addressing an argument that the parties formed a partnership under 6 *Del. C.* § 15-202 in the alternative to a breach of contract claim).

46

never reached a meeting of the minds on what that relationship would look like. Schaeffer has variously suggested he owns an interest in 25%, 28.33%, and 33.33% in the Subdivision or its profits.[241] While Lockwood's understanding sharpened when he perceived Garrison offered a way to appease Schaeffer and O'Brien and remove them from the project, even these more concrete statements fail to illustrate any mutually agreed-upon terms. Indeed, the uncertainty surrounding Schaeffer's and O'Brien's interest is part of what drove Garrison away from the buyout talks. The terms were uncertain because the parties never had a meeting of the minds.[242]

The shifting and uncertain terms reflect the parties' overarching dynamic of side conversations, pacifying broad promises, and "fluid" negotiations.[243] The evidence at trial supports the existence of a business relationship, but does not permit the conclusion that a reasonable negotiator in Schaeffer's position would have concluded that these discussions "constituted agreement on all of the terms that the parties themselves regarded as essential and thus that agreement concluded the

---

[241] *E.g.*, D.I. 62 at 20–21; D.I. 66 at 9–10.

[242] When pressed, Schaeffer fell back on vague statements that do not illuminate any agreement's terms. *See* Tr. 375 ("I just knew I was a partner in the deal."); *id.* 383 ("I knew I had an interest in this project"); *id.* 360 ("I just knew that we were doing this deal and we were all partners.").

[243] *E.g.*, Tr. 216, 262, 320.

negotiations."[244]  Thus, I find Schaeffer has failed to establish the existence of a contract with Lockwood by a preponderance of the evidence.

This finding has several consequences.  First, it dooms Count II, Schaeffer's breach of contract claim.  Because he cannot show the existence of a contract by preponderance of the evidence, he also cannot show the necessary clear and convincing evidence required to earn specific performance, dooming Count I.

Count III for breach of the implied covenant of good faith and fair dealing also fails.  "Despite the appearance in its name of the terms 'good faith' and 'fair dealing,' the covenant does not establish a free-floating requirement that a party act in some morally commendable sense."[245]  Rather, the implied covenant is a limited gap-filling mechanism, tied to the language of an existing contract.  Imposing obligations through the implied covenant is a "cautious enterprise,"[246] guided by "what was expressly agreed upon" in the language of the contract itself.[247]  The implied covenant does not exist in the absence of a contract.

Judgment is entered for Lockwood on Counts I, II, and III.

---

[244] *Innoviva*, 2017 WL 6209597, at *21 (quoting *Leeds*, 521 A.2d at 1097).

[245] *Allen v. El Paso Pipeline GP Co., L.L.C.*, 113 A.3d 167, 182–83 (Del. Ch. 2014), *aff'd*, 2015 WL 803053 (Del. Feb. 26, 2015) (TABLE).

[246] *Superior Vision Servs., Inc. v. ReliaStar Life Ins. Co.*, 2006 WL 2521426, at *6 (Del. Ch. Aug. 25, 2006).

[247] *Lonergan v. EPE Hldgs., LLC*, 5 A.3d 1008, 1018 (Del. Ch. 2010) (quoting *Katz v. Oak Indus. Inc.*, 508 A.2d 873, 880 (Del. Ch. 1986)); *see El Paso Pipeline*, 113 A.3d at 183.

## B. Schaeffer Has Not Proven Promissory Estoppel.

Schaeffer also presents two quasi-contract claims. Count IV is for promissory estoppel. "Promissory estoppel is fundamentally a narrow doctrine, designed to protect the legitimate expectations of parties rendered vulnerable by the very processing of attempting to form commercial relationships."[248] To establish this claim,

> a plaintiff must prove by clear and convincing evidence that: "(i) a promise was made; (ii) it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promisee; (iii) the promisee reasonably relied on the promise and took action to his detriment; and (iv) such promise is binding because injustice can be avoided only by enforcement of the promise."[249]

---

[248] *Ramone*, 2006 WL 905347, at *14; *see also id.* ("For that reason, although it is permissible to award a party prevailing on a claim for promissory estoppel expectation damages comparable to that it would have received had the hoped-for contract actually been effected, the more routine role of promissory estoppel should be to assure that those who are reasonably induced to take injurious action in reliance upon non-contractual promises receive recompense for that harm. Even when used in that careful manner, the doctrine of promissory estoppel hazards unfairness, as many possible contractual relationships in commerce require the hopeful partners to expend costs and put aside other opportunities in the hopes of forging an agreement. Therefore, courts must be chary about invoking the doctrine lightly, lest the normal failure of parties to reach a binding contract be penalized by an imprecise judicial cost-shifting exercise." (footnote omitted)).

[249] *Windsor I, LLC v. CWCapital Asset Mgmt. LLC*, 238 A.3d 863, 876 (Del. 2020) (quoting *SIGA Techs., Inc. v. PharmAthene, Inc.*, 67 A.3d 330, 347–48 (Del. 2013)); *see McKee v. McKee*, 2007 WL 1378349, at *23 (Del. Ch. May 3, 2007) (reciting this standard and applying it in a post-trial opinion) (citing *Lord v. Souder*, 748 A.2d 393, 399 (Del. 2000)).

Promissory estoppel requires "a real promise, not just mere expressions of expectation, opinion, or assumption."[250] Such a promise must be "reasonably definite and certain."[251] Schaeffer's burden of clear and convincing evidence requires evidence that "produces an abiding conviction that the truth of the contention is highly probable."[252]

Schaeffer failed to carry this heavy burden at trial. He has not established the first element: that Lockwood made a reasonably definite and certain promise. Schaeffer, Lockwood, and O'Brien had discussions on how to structure their joint venture from March to June 2015, and Schaeffer particularly relies on Lockwood's June 2015 email asking O'Brien to set up an LLC with the trio as equal one-third members. As I have explained, this statement conflicts with other evidence in the

---

[250] *James Cable, LLC v. Millennium Digital Media Sys., L.L.C.*, 2009 WL 1638634, at *5 (Del. Ch. June 11, 2009) (internal quotation marks omitted) (quoting *Addy v. Piedmonte*, 2009 WL 707641, at *22 (Del. Ch. Mar. 18, 2009)).

[251] *Id.*

[252] *In re Martin*, 105 A.3d 967, 975 (Del. 2014) (internal quotation marks omitted) (quoting *In re Bailey*, 821 A.2d 851, 863 (Del. 2003)). This is an exacting standard:

> The clear and convincing standard requires evidence that produces in the mind of the trier of fact an abiding conviction that the truth of the factual contentions is highly probable. Similarly, the pattern civil jury instruction used by the Delaware Superior Court provides, in part, [t]o establish proof by clear and convincing evidence means to prove something that is highly probable, reasonably certain, and free from serious doubt. We believe that this pattern jury instruction is a proper articulation of the standard.

*Hudak v. Procek*, 806 A.2d 140, 147 (Del. 2002) (footnotes, alterations, and internal quotation marks omitted) (compiling sources).

record, which variously suggests Lockwood contemplated Schaeffer would hold 25% or 28.33% in the Subdivision or its profits. And while Lockwood's 2017 and 2018 acknowledgements of Schaeffer's "percentage"[253] or "share profits"[254] support the idea that Lockwood believed Schaeffer had some interest in the project, they fall well short of clear and convincing evidence that Lockwood made a "reasonably definite and certain" promise to Schaeffer of 33% of the Subdivision or its profits.[255]

These fluid conversations over the years never solidified into a promise. For the same reasons these statements do not form the basis of a contract, I conclude they are not clear and convincing evidence of a reasonably definite and certain promise that Schaeffer would receive a one-third interest in an LLC owning the Subdivision, nor one third of its profits.[256]

---

[253] JX 58 at 5.

[254] JX 68 at 2.

[255] *See James Cable*, 2009 WL 1638634, at *5; *see also McKee*, 2007 WL 1378349, at *1 (rejecting promissory estoppel claim and noting "[v]arious agreements were drafted to define [the parties'] business relationships, but none was ever accepted or signed" by the claimant). The promissory estoppel plaintiff in *McKee* similarly attempted to cobble together a "promise" based on circumstantial evidence. The Court noted that it failed to meet its burden to show clear and convincing evidence: "George and JoAnn discussed, on many occasions, George's acquisition of an ownership interest in the Marina. They never reached common ground and there is no credible direct evidence that JoAnn ever promised George a one-half (or any other specific fractional) interest in the Marina." *McKee*, 2007 WL 1378349, at *3 (footnotes omitted).

[256] Malmberg testified that if Lockwood ever promised Schaeffer any particular interest, he did not know what that interest was. *See* Tr. 161 ("And I think that if John [O'Brien] and Mark [Schaeffer] were promised something, then they deserve what they were promised. But I don't know what it was.").

Even Lockwood's most concrete statements, made during buyout negotiations with Garrison and beyond, cannot support a promissory estoppel claim. Schaeffer fails to prove, as he must, that Lockwood made these statements with the expectation they would induce Schaeffer into further work on the Subdivision.[257] The First Draft Release, which recited that Schaeffer and O'Brien were entitled to 28.33% of the Subdivision's profits,[258] was made as part of Lockwood's efforts to "feed the wolfs"[259] and ensure Schaeffer's exit, not to induce him to stay. So were other draft buyout documents Lockwood prepared.[260] And more fundamentally, Schaeffer has failed to prove he relied on Lockwood's later statements. Schaeffer's claimed reliance was his "sweat equity":[261] the time and effort he put into "getting the permits together, getting the approvals in place, keeping the approvals in place, and helping manage the project through development and sale."[262] Most, if not all, of these efforts occurred in 2015 and 2016, after Lockwood's indefinite statements but

---

[257] *See, e.g.*, *Windsor I, LLC*, 238 A.3d at 876.

[258] JX 52 at 2.

[259] JX 38 at 1.

[260] *E.g.*, JX 58 at 5 (reciting that Schaeffer is "entitled to a percentage" of Lockwood's 85% profit interest).

[261] *See* D.I. 62 at 28.

[262] *See* Tr. 380. Schaeffer consistently described these efforts as his "equity" in the project. *E.g.*, *id.* 352, 368, 380.

long before the more specific 2017 buyout negotiations with Garrison.[263]  By the time Lockwood emailed Schaeffer acknowledging his "share profits"[264] in April 2018, Schaeffer was no longer involved in the project and, instead, was feuding with Lockwood.  Thus, Schaeffer's early work was not induced by Lockwood's more particular 2017 statements.

Schaeffer has failed to establish the necessary elements for promissory estoppel.  Judgment is entered for Lockwood on Count IV.

### C.    Schaeffer Has Proven Unjust Enrichment.

Schaeffer's final claim is for unjust enrichment.  "Unjust enrichment is the 'unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience.'"[265]  "As its name implies, unjust enrichment is a flexible doctrine that a court can deploy to avoid injustice."[266]  It is "a theory of recovery to remedy the

---

[263] *See* D.I. 62 at 28 (arguing Schaeffer's efforts "[t]hroughout the summer of 2015" support his promissory estoppel claim).

[264] JX 68 at 2.

[265] *E.g.*, *Doberstein v. G-P Indus., Inc.*, 2015 WL 6606484, at *6 (Del. Ch. Oct. 30, 2015) (quoting *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 891–92 (Del. Ch. 2009)); *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010) (quoting *Fleer Corp. v. Topps Chewing Gum, Inc.*, 539 A.2d 1060, 1062 (Del. 1988)).

[266] *Frederick Hsu Living Tr. v. ODN Hldg. Corp.*, 2017 WL 1437308, at *42 (Del. Ch. Apr. 14, 2017).

absence of a formal contract."[267]  To prevail on his unjust enrichment claim, Schaeffer must prove the following elements by a preponderance of the evidence: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law.[268]

Schaeffer has carried his burden.  The first two elements—an enrichment and an impoverishment—are connected.[269]  Lockwood received the benefit of Schaeffer's work as a real estate broker in finding and securing the Subdivision, as well as his support of the project after Lockwood and Malmberg purchased it.[270]

---

[267] *Choupak v. Rivkin,* 2015 WL 1589610, at *20 (Del. Ch. Apr. 6, 2015) (quoting *ID Biomedical Corp. v. TM Techs., Inc.,* 1995 WL 130743, at *15 (Del. Ch. Mar. 16, 1995)).

[268] *Nemec*, 991 A.2d at 1130 (citing *Jackson Nat. Life Ins. Co. v. Kennedy*, 741 A.2d 377, 394 (Del. Ch. 1999), and *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 585 (Del. Ch. 1998)).

[269] *See id.* at 1130 n.37 ("'Impoverishment' does not require that the plaintiff seeking a restitutionary remedy suffer an actual financial loss, as distinguished from being deprived of the benefit unjustifiably conferred upon the defendant." (citing *MetCap Sec. LLC v. Pearl Senior Care, Inc.*, 2009 WL 513756, at *5 n. 26 (Del.Ch. Feb. 27, 2009), *aff'd*, 977 A.2d 899 (Del. 2009) (ORDER))).

[270] I note that Schaeffer's efforts may have, indirectly, enriched Malmberg, as well. Malmberg is not a defendant in this action.  "Unjust enrichment only is available to the impoverished party if the enriched party is the defendant." *Encore Preakness, Inc. v. Chestnut Health & Rehab. Gp., Inc.*, 2017 WL 5068753, at *3 (Del. Super. Nov. 1, 2017). In *Encore Preakness*, the Superior Court quoted the following discussion from this Court's decision in *United Health Alliance, LLC v. United Medical, LLC*, 2014 WL 6488659 (Del. Ch. Nov. 20, 2014):

Schaeffer's emails to Cecil Bank during the initial negotiations suggest that Lockwood would buy the Subdivision and that Schaeffer was representing him in that endeavor.[271] Lockwood, Malmberg, and Schaeffer all agreed Schaeffer "bird-dogged" the project, attempting to secure the deal and compensation.[272] After DBC

> To recover under a theory of quasi contract, a plaintiff must demonstrate that *services were performed for the defendant* resulting in its unjust enrichment. It is not enough that the defendant received a benefit from the activities of the plaintiff; if the services were performed at the behest of someone other than the defendants, the plaintiff must look to that person for recovery.

*Encore Preakness*, 2017 WL 5068753, at *3 (alteration omitted) (quoting *United Health*, 2014 WL 6488659, at *8). The *Encore Preakness* Court then dismissed the unjust enrichment claim because the plaintiff performed no services for the named defendants, and, if those defendants were enriched, it was at the expense of a third party. 2017 WL 5068753, at *4.

Lockwood did not argue Schaeffer's decision not to sue Malmberg bars recovery here, and so, strictly speaking, it is waived. *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999). Because the parties' briefs were remarkably thin on unjust enrichment, I have considered this issue anyway. I conclude that it does not bar recovery here because Schaeffer's efforts, especially early in the Subdivision project, were performed for Lockwood, not Malmberg. Moreover, Lockwood and Malmberg understood that any role Schaeffer and O'Brien had was part of Lockwood's contribution to the deal and that it would therefore be Lockwood's responsibility to "feed the wolfs." JX 38 at 1; Tr. 129, 236.

[271] *See, e.g.*, JX 15 at 96 ("Per our conversation yesterday, you were giving me until this morning to speak with Don Lockwood regarding his purchase of the [Subdivision]. I spoke with Don. I was unaware that he had already signed your contract and delivered it to the escrow agent. He asked me to inform you that if Cecil Bank does not honor the contract they sent him for the sale of [the Subdivision] that his attorney will be filing an action in Chancery Court today to prevent the transfer of title to a third party. Please let me know the banks position as Don would like to purchase this property.").

[272] *See* Tr. 114, 116, 185; *see id.* 317 ("But, you know, I was -- I was the one that was bird-dogging this whole project."); *see also id.* 146 (Malmberg discussing Schaeffer's role as a "project beneficiar[y]" and noting he had an "interest in getting paid a commission or some other benefit out of the project . . . because he was putting effort into it"). I note that Schaeffer testified that he "wasn't a broker in this transaction," but I discredit this

purchased the Subdivision, Schaeffer continued to aid the project by helping secure a takedown agreement with Statera, working to avoid the County "sunsetting" the project, and making periodic site visits. Lockwood engaged in protracted negotiations with Garrison, recognizing Schaeffer had to be compensated. Lockwood got the benefit of Schaeffer's services, but did not compensate Schaeffer. Thus, Lockwood was enriched, and Schaeffer suffered a related impoverishment.

In so many words, Lockwood argues that Schaeffer has not been impoverished because DBC awarded Ruby Schaeffer the Listing Agreement on the Subdivision as compensation for Schaeffer's efforts.[273] This contention has several flaws. First, Ruby Schaeffer is not Mark Schaeffer. And there is no evidence in the record to suggest Schaeffer agreed to this structure. Further, Ruby Schaeffer and Gallo Realty had to work for their commissions; simply securing the Listing Agreement was not enough to pocket the money. Finally, Lockwood's argument ignores the fact that even after the Listing Agreement, he continued to try to secure a buyout for Schaeffer or otherwise have him surrender his interest in the

---

testimony as part of his effort to secure a profit share through litigation. *See id.* 352; *see also id.* 318, 362.

[273] *See id.* 242 ("That's why we gave Ruby Schaeffer the listing, for compensation; and I was paying Mr. O'Brien on a monthly basis to work the deal. And everyone knew the deal."); Tr. 285 ("I agreed with Conny [Malmberg] to allow Ruby Schaeffer, Mark [Schaeffer]'s partner in the real estate, to list all the lots with the Statera takedown with my potential Lockwood Design & Construction build, gave her the listings on all that at a higher rate for compensation for Mr. Schaeffer.").

Subdivision,[274] to "get [him] out of the deal."[275] Never during these discussions did Lockwood suggest Schaeffer's "sweat equity" had been compensated by the Listing Agreement. Even after the Listing Agreement, Lockwood did not believe Schaeffer had been fully compensated.

The fourth element of an unjust enrichment claim is the absence of a justification. As explained, Lockwood has repeatedly acknowledged, both before and after this litigation began, that Schaeffer was owed something for his efforts in the Subdivision. In his brief, Lockwood continues this trend, arguing Schaeffer "might have qualified for a real estate commission" and that the proper legal theory would have been *quantum meruit*.[276] This theory overlaps substantially with unjust enrichment and is animated by the same fundamental principle: that Schaeffer's work on the project should not go uncompensated.[277] Lockwood does not

---

[274] *E.g.*, JX 56; JX 57; JX 58; JX 71.

[275] Tr. 255.

[276] D.I. 61 at 19; *see also* D.I. 65 at 14.

[277] *Quantum meruit* is "a quasi-contract claim that allows a party to recover the reasonable value of his or her services if: (i) the party performed the services with the expectation that the recipient would pay for them; and (ii) the recipient should have known that the party expected to be paid." *Petrosky v. Peterson*, 859 A.2d 77, 79 (Del. 2004) (citing *Constr. Sys. Gp., Inc. v. Council of Sea Colony, Phase I*, 670 A.2d 1337 (Del. 1995)). It literally means "as much as he deserves." *ITEC Drywall, LLC v. S. Main St. Plaza, LLC*, 2021 WL 3783645, at *5 (Del. Super. Aug. 3, 2021) (quoting *Marta v. Nepa*, 385 A.2d 727, 730 (Del. 1978)). Several cases have recognized the overlap between *quantum meruit* and unjust enrichment. *E.g.*, *Applied Energetics, Inc. v. Farley*, 239 A.3d 409, 413, 450 (Del. Ch. 2020) (compiling sources)); *Endowment Rsch. Gp., LLC v. Wildcat Venture P'rs, LLC*, 2021 WL 841049, at *13 (Del. Ch. Mar. 5, 2021) (quoting *Nemec*, 991 A.2d at 1130, and *Petrosky*, 859 A.2d at 79); *Greto v. Joseph L. Messa, Jr. & Assocs., P.C.*,

meaningfully dispute that Schaeffer earned something for his work on the Subdivision, or that it would be unjust to permit that work to go uncompensated.

The final element is the absence of an adequate remedy at law. This element is not meaningfully in dispute, especially given that I have concluded Schaeffer's contract claims fail. "Because there is no contract between [Schaeffer] and [Lockwood] (or any other basis for recovery at law from [Lockwood]), [Schaeffer] does not have an adequate remedy at law."[278]

In sum, "[f]inding for [Schaeffer] on the basis of unjust enrichment is the equitable remedy here."[279] It fairly compensates him for the time and effort he put in "bird-dogging" and otherwise supporting the Subdivision project, which unfairly enriched Lockwood and made it easier for him to purchase and develop the Subdivision with Malmberg. Judgment is entered for Schaeffer on Count V.

### D. Schaeffer Is Entitled To Damages For Unjust Enrichment.

Having found Schaeffer is entitled to recover on his unjust enrichment claim, I turn to the difficult question of assessing his damages. "Once liability has been found, and the court's powers shift to the appropriate remedy, the Court of Chancery

---

2018 WL 3559262, at *3 (Del. Super. July 23, 2018). Though they are related, *quantum meruit* and unjust enrichment are separate claims. *See Hynansky v. 1492 Hosp. Gp., Inc.*, 2007 WL 2319191, at *2 (Del. Super. Aug. 15, 2007).

[278] *MetCap*, 2009 WL 513756, at *6.

[279] *Jackson*, 2018 WL 1935961, at *9.

has broad discretion to craft a remedy to address the wrong."[280] "The most likely measure for damages under an unjust enrichment claim would be the amount by which [Lockwood] was unjustly enriched."[281] This often involves quantifying the defendant's profits.[282]

Schaeffer faces an uphill climb in proving damages. He effectively presented no evidence about Lockwood's profits from the Subdivision. Instead, Schaeffer relied exclusively on his counsel's back-of-the-napkin damages model, based entirely on his hypothetical estimates for the Subdivision's "total potential revenue,"[283] as distinguished from the money DBC actually made. Extrapolating from that model, Schaeffer claims he would have made $453,638.46.[284] Schaeffer's thought experiment is speculative and deeply flawed.[285] More fundamentally, it is

---

[280] *Brinckerhoff v. Enbridge Energy Co.*, 159 A.3d 242, 262 (Del. 2017); *see also Harman v. Masoneilan Int'l, Inc.*, 442 A.2d 487, 499 (Del. 1982) ("On the other hand, equity adopts its decrees to fit the nature and gravity of the breach and the consequences to the beneficiaries and trustee. The choice of relief to be accorded a prevailing plaintiff in equity is largely a matter of discretion with the Chancellor." (alterations internal quotation marks omitted) (compiling sources)).

[281] *Mehta v. Smurfit-Stone Container Corp.*, 2014 WL 5438534, at *6 (Del. Ch. Oct. 20, 2014).

[282] *See Del. Express Shuttle, Inc. v. Older*, 2002 WL 31458243, at *15 (Del. Ch. Oct. 3, 2002).

[283] D.I. 62, Ex. 1; *see also* Tr. 341, 343–46.

[284] D.I. 62, Ex. 1; *see also* Tr. 346.

[285] *See Mehta*, 2014 WL 5438534, at *6 ("The law does not promote speculative damages at the defendant's expense." (alterations and internal quotation marks omitted) (quoting *Ryan v. Tad's Enters., Inc.*, 709 A.2d 682, 689 (Del. Ch. 1996), *aff'd*, 693 A.2d 1082 (Del. 1997))).

keyed to what Schaeffer claims Lockwood promised him, not to any amount by which Lockwood was unjustly enriched.

As I see it, Lockwood was enriched, and Schaeffer was impoverished, because Lockwood got the benefit of Schaeffer's work without paying for it. In effect, Schaeffer served as a bird-dogging real estate broker, helping Lockwood negotiate the Subdivision's purchase, sending emails to Cecil Bank, and running down permits. Customarily, real estate brokers earn commissions for their work, a percentage of the purchase price.[286] The only evidence in the record about what a fair commission would be on a project comparable to the Subdivision is that Ruby Schaeffer and her firm earned an 8% commission on lots sold.[287] Credible testimony in the record suggests this figure is slightly high and that a typical real estate broker would earn between 5% and 6%.[288] But I conclude that any overpayment in Schaeffer's commission is justified in light of the other work he did on the project. In addition to his work as a broker connecting Lockwood with the Subdivision deal, Schaeffer continued to help with the Subdivision project after Lockwood and Malmberg purchased it. He helped secure and negotiate the takedown agreement

---

[286] *See, e.g.*, Tr. 185–86, 318, 372.

[287] JX 32 at 1, 5; *see also* Tr. 372.

[288] *See* Tr. 202.

with Statera, worked on avoiding "sunsetting" from the County, and made periodic site visits.

I believe that an 8% commission is fair to Schaeffer in these circumstances. Lockwood and Malmberg purchased the Subdivision for $390,000;[289] an 8% commission on that purchase is $31,200.[290] Judgment is entered for Schaeffer on Count V in the amount of $31,200.

### E. Lockwood Has Not Established His Counterclaim.

Lockwood also presented a counterclaim, alleging he and Schaeffer "agreed Schaeffer would sell 1.66% of his interest in [222 Enterprises] to Lockwood" for $100,000, and that Lockwood satisfied his end of the bargain by paying Schaeffer $100,000 but Schaeffer did not transfer his 1.66% interest.[291] Though he does not specify in his answer or his briefs, I understand Lockwood's counterclaim to assert a breach of contract theory.

Lockwood bears the burden of establishing a contract with Schaeffer to sell him a 1.66% interest in 222 Enterprises for $100,000 by a preponderance of the

---

[289] *See* JX 24 at 2.

[290] I note that Lockwood ultimately paid O'Brien $8,000 for his efforts on the Subdivision. Tr. 36–39, 61, 285. I have no insight into whether that arrangement was fair, but it appears to have appeased O'Brien. Schaeffer's efforts were more substantial than O'Brien's, justifying a higher award.

[291] D.I. 6 at 20.

evidence.[292] There is little documentary evidence on the subject, and Lockwood allotted it less than three double-spaced pages across his three trial briefs.[293] The only evidence in the record supporting Lockwood's position is: (1) an unsigned "bill of sale" indicating Schaeffer would sell Lockwood his 1.66% interest in 222 Enterprises for $100,000;[294] (2) two checks Lockwood paid to Schaeffer Management Company, totaling $101,190, one with the memo line "consulting";[295] and (3) Lockwood's own testimony that the checks were meant to serve as consideration for Schaeffer transferring the 1.66% interest.[296]

The unsigned bill of sale Lockwood presented to Schaeffer is no more a contract evidencing Lockwood's entitlement to 1.66% of 222 Enterprises than the unsigned First Draft Release is a contract evidencing Schaeffer's interest in the Subdivision's profits. They both suggest an offer was made but lack any indicia of mutual assent. While the checks Lockwood paid to Schaeffer Management Company, owned by Ruby Schaeffer, suggest an oral contract, there are

---

[292] *See, e.g.*, *Pulieri*, 2015 WL 691449, at *5.

[293] *See* D.I. 38 at 29; D.I. 61 at 26–27. Lockwood did not address his counterclaim in his post-trial answering brief. *See generally* D.I. 65.

[294] JX 7.

[295] JX 8.

[296] *E.g.*, Tr. 260–64.

62

inconsistencies. The checks were not for exactly $100,000, and notably, one included a notation indicating the payment was for "consulting."[297]

Lockwood faults Schaeffer for not producing invoices reflecting that he served as Lockwood's consultant.[298] The lack of invoices is consistent with the parties' extremely informal business relationship; invoices would be surprising. More fundamentally, it is not Schaeffer's burden to disprove Lockwood's counterclaim; Lockwood bears the burden to prove it was more likely than not the parties formed a contract.[299] I cannot make that finding on this scant record.

At best, the evidence here is in equipoise. It is conceivable to me that Lockwood is telling the truth, and only the extra $1,190 in Schaeffer's second check was meant to cover "consulting," per the memo line. But it is also conceivable to me that Schaeffer is telling the truth and Lockwood's large checks were for consulting, paid after the fact and to a different entity per their custom. Neither Schaeffer nor Lockwood's testimony prevails as more credible. O'Brien's testimony favored Schaeffer, as he testified Lockwood's payments to O'Brien around that time were also for consulting.[300] Ultimately, "the preponderance of the

---

[297] *See* JX 8.

[298] *See* D.I. 61 at 27.

[299] *See, e.g.*, *Pulieri*, 2015 WL 691449, at *5 ("Under Delaware law, a party asserting a breach of an oral agreement must prove the existence of an enforceable contract by a preponderance of the evidence.").

[300] *See* Tr. 54–55; *see also id.* 102.

evidence standard [] means that if the evidence is in equipoise, Plaintiffs lose."[301]

This is the case here. Judgment is entered for Schaeffer on Lockwood's counterclaim.

### F. Fee Shifting Is Not Appropriate In This Case.

Schaeffer also asks the Court to shift his legal fees to Lockwood.[302]

> Under the American Rule, litigants are expected to bear their own costs of litigation absent some special circumstances that warrant a shifting of attorneys' fees, which, in equity, may be awarded at the discretion of the court. The bad faith exception to the American Rule applies in cases where the court finds litigation to have been brought in bad faith or finds that a party conducted the litigation process itself in bad faith, thereby unjustifiably increasing the costs of litigation.[303]

The Court does not invoke this exception lightly.[304] Of course, "[t]here is no single standard of bad faith that warrants an award of attorneys' fees in such situations; rather, bad faith is assessed on the basis of the facts presented in the case."[305] But vigorous litigation is not enough. "Bad faith means a litigation position in furtherance of abuse of process that is manifestly incompatible with justice. It means

---

[301] *Martin*, 2015 WL 6472597, at *10 (internal quotation marks and footnotes omitted) (quoting *OptimisCorp*, 2015 WL 5147038, at *55).

[302] *See* D.I. 61 at 32–35.

[303] *Beck v. Atl. Coast PLC*, 868 A.2d 840, 850–51 (Del. Ch. 2005) (footnotes omitted) (citing *Barrows v. Bowen*, 1994 WL 514868, at *1 (Del. Ch. Sept. 7, 1994), and *Arbitrium (Cayman Islands) Handels v. Johnston*, 705 A.2d 225, 231 (Del. Ch. 1997)).

[304] *See id.* at 851.

[305] *Id.*

frivolous opposition in an attempt to game the system."[306]  Schaeffer has submitted no evidence that Lockwood's litigation positions come anywhere close to bad faith. Schaeffer's argument rests exclusively on his belief that Lockwood was unjustified in denying a "deal between the three partners [Schaeffer, O'Brien, and Lockwood] to split the project three ways, and that Schaeffer was entitled to a one-third interest."[307]  I disagree, and in fact have found that Schaeffer and Lockwood never reached such an agreement.  Schaeffer and Lockwood will each bear his own costs.

## III.   CONCLUSION

For the foregoing reasons, judgment is entered for Lockwood on Counts I, II, III and IV.  Judgment is entered for Schaeffer on Count V in the amount of $31,200. Judgment is also entered for Schaeffer on Lockwood's counterclaim.  Each will bear his own costs.  The parties will confer and submit a stipulated final order within thirty days.

---

[306] *Donnelly v. Keryx Biopharmaceuticals, Inc.*, 2019 WL 5446015, at *6 (Del. Ch. Oct. 24, 2019).

[307] *See* D.I. 61 at 34.